## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOUNDLESS BROADBAND, LLC, *et al.* | Case No. 25-10948 (BLS) |
| Debtors.[1] | (Jointly Administered) |
|  | **Hearing Date: July 24, 2025 at 10:00 a.m. (ET)** |
|  | **Objection Deadline: July 17, 2025 at 4:00 p.m. (ET)** |

**MOTION OF DEBTORS FOR ENTRY OF: (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTORS, (B) SCHEDULING AN AUCTION AND A SALE HEARING, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) AUTHORIZING DESIGNATION OF STALKING HORSE BIDDER, (E) APPROVING BID PROTECTIONS, (F) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (G) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF**

Boundless Broadband, LLC ("**Boundless**"), Tilson Technology Management, Inc. ("**TTMI**"), and Tilson Middle Street Holding, LLC ("**TMSH**"), the above-captioned debtors and debtors-in-possession (each, a "**Debtor**" and, collectively, the "**Debtors**"), by and through their undersigned proposed counsel, hereby move this Court, pursuant to §§ 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 6004-1 of the Local Rules of Bankruptcy Procedure of the Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for the entry of the following:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Boundless Broadband, LLC (9851), Tilson Technology Management, Inc. (9537) and Tilson Middle Street Holding, LLC (9323). The Debtors' mailing address is 16 Middle Street, 4th Floor, Portland, ME 04101.

(i)     an order, substantially in the form attached hereto as **Exhibit A** (the "**Bid Procedures Order**"), (a) approving procedures in connection with the potential sale of substantially all of the assets of the Debtors in the form attached to the Bid Procedures Order as **Exhibit 1** (the "**Bid Procedures**"), (b) scheduling an auction and hearing to consider approval of the sale of the Assets (as defined below), (c) approving the form and manner of notice thereof, (d) authorizing the Debtors to designate one or more stalking horse bidders (each, a "**Stalking Horse Bidder**") and to enter into one or more asset purchase agreements with such Stalking Horse Bidder(s) (each, a "**Stalking Horse APA**") for the sale of all or substantially all of the Debtors' assets (the "**Assets**"), (e) approving certain bid protections for any Stalking Horse Bidder(s), (f) approving procedures related to the assumption and assignment of certain executory contracts and unexpired leases, and (g) granting related relief; and

(ii)    an order, substantially in the form to be filed in advance of the sale hearing (the "**Sale Order**"), (x) approving the sale of the Assets free and clear of all liens, claims, encumbrances, and other interests (except certain assumed liabilities and/or permitted liens), (y) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto, and (z) granting related relief.

In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

55734083.3

3.      The statutory predicates for the relief requested in this Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rule 6004-1.

## BACKGROUND

A.      **The Chapter 11 Cases**

4.      On May 29, 2025 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). A description of the Debtors' capital and corporate structures, businesses, and the events leading to the commencement of these chapter 11 cases, as well as the facts and circumstances relevant to this Motion, are set forth in the *Declaration of Richard Arrowsmith, Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 4] (the "**First Day Declaration**").

5.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1007(a) and 1108 of the Bankruptcy Code.  To date, no trustee, examiner, or statutory committee has been appointed in the cases by the United States Trustee (the "**U.S. Trustee**").

B.      **The DIP Facility and the Sale and Marketing Process**

6.      Prior to the Petition Date, the Debtors and their advisors determined that, absent sufficient additional financing, a sale of the Debtors' assets was likely to be the best way to maximize the value of the Debtors' estates for the benefit of the Debtors' creditors, employees, and other stakeholders.  As discussed in more detail in the First Day Declaration, the suspension of work on the projects with the Debtors' largest client—Gigapower, LLC ("**Gigapower**")—due to Gigapower's termination for convenience of the contracts with the Debtors in 2025 rendered

the status quo untenable.  Accordingly, beginning in May 2025, the Debtors and their advisors embarked on two major endeavors (among others at the time): (i) negotiating with their prepetition lenders on the terms of a postpetition financing facility, and (ii) identifying an investment banker to market their assets as a going concern.

7.      The Debtors ultimately selected Woodward Park Partners, LLC ("**Woodward**") as their investment banker, which, in mid-May 2025, immediately began marketing the Debtors' assets as a going concern.  The marketing process, which is ongoing, has involved Woodward contacting various parties that the Debtors and their advisors believe could be potential purchasers, including parties who have shown interest in the Debtors' assets in the past and potential financial and strategic purchasers.  As a result of these efforts, numerous parties have signed or are in the process of signing non-disclosure agreements to receive additional information.  Woodward has prepared and circulated to interested parties who have signed non-disclosure agreements an information memorandum and a process letter, and a data room has been made available to such parties.

8.      The sale process is subject to certain milestones (the "**Milestones**") under the Debtors' debtor-in-possession financing.  These Milestones were intended to preserve the going-concern value of the business through a timely and efficient sale process, while maximizing the benefit of the available postpetition liquidity. On May 30, 2025, this Court entered its interim order [D.I. 35] (together with any final order approving the relief granted therein, the "**DIP Order**") authorizing, among other things, the Debtors to obtain post-petition financing pursuant to the DIP Credit Agreement by and among the Debtors and the DIP Secured Parties (each as defined in the DIP Order) and approving the Milestones.

C.    **Summary of the Proposed Transaction, Stalking Horse Designation Rights, and Bid Procedures**

9.    As the Debtors continue to market their assets, they seek authority to (i) designate a Stalking Horse Bidder (or multiple Stalking Horse Bidders) for the Assets (or various portions of the Assets) on or before June 25, 2025 (or such other date as may be agreed between the Debtors and the DIP Secured Parties in accordance with the DIP Order), (ii) execute, subject to higher or otherwise better offers consistent with the Bid Procedures, one or more purchase agreements memorializing the proposed transaction set forth in any Stalking Horse APA, and (iii) grant the Stalking Horse Bidder(s), in the exercise of the Debtors' reasonable business judgment: (x) a break-up fee of three percent (3.0%) of the total cash consideration payable under such Stalking Horse APA and (y) reimbursement of the Stalking Horse's reasonable out-of-pocket expenses, capped at $100,000 (together, the "**Bid Protections**").

10.    To the extent an agreement is reached with one or more Stalking Horse Bidders, the Debtors intend to file a notice of their selection of one or more Stalking Horse Bidders in advance of the hearing on the Bid Procedures Motion (a "**Stalking Horse Notice**") that will specify: (a) the identity of any Stalking Horse Bidder(s); (b) the consideration under any Stalking Horse APA(s); (c) a copy of the Stalking Horse APA(s); (d) the proposed Bid Protections to be provided to any Stalking Horse Bidder(s); and € a declaration in support of the proposed Bid Protections, which includes whether any Stalking Horse Bidder has any connection with the Debtors other than that which arises from any Stalking Horse APA.

11.    The Debtors and their advisors developed the Bid Procedures to be flexible, transparent, and competitive in order to attain the highest or otherwise best price for the Assets under the circumstances. Under the Bid Procedures, qualified parties may submit bids that will be analyzed by the Debtors, their professionals, and the Consultation Parties (as defined in the Bid

Procedures), which will culminate in the Debtors designating a Stalking Horse Bidder or other

Qualified Bidder as the Successful Bidder to purchase the Assets (or a portion thereof).  The

Debtors believe that the Bid Procedures, in connection with any Stalking Horse APA(s), will

provide the best opportunity to consummate a value-maximizing transaction that also secures

employment for the Debtors' employees and preserves the going-concern value of the enterprise.

12.     The Debtors also believe that it is critical and warranted that the sale process be

consummated on the timeline set forth in the Bid Procedures and this Motion to allow the Debtors

to satisfy the Milestones.  The sale timeline was specifically designed to balance the goals of (a)

continuing a marketing process, and (b) preserving and maximizing the value of the Assets, while

(c) also considering the value-deteriorating cost and risk of a protracted Chapter 11 sale process.

## RELIEF REQUESTED

13.     By this Motion, , the Debtors seek entry of the Bid Procedures Order:

(a)     approving the Bid Procedures attached to the Bid Procedures Order as **Exhibit 1** in connection with the sale of the Assets (the "**Sale Transaction**");

(b)     scheduling an auction (the "**Auction**") and sale hearing (the "**Sale Hearing**") with respect to the Sale Transaction;

(c)     approving the form and manner of notice of the Auction and the Sale Hearing, a copy of which is attached to the Bid Procedures Order as **Exhibit 2** (the "**Sale Notice**");

(d)     approving entry into one or more Stalking Horse APAs and approving the Bid Protections for the Stalking Horse Bidder(s), if any, and approving an initial overbid equal to the Bid Protections plus **$500,000** (the "**Initial Overbid**");

(e)     approving procedures for the assumption and assignment (as set forth in the Bid Procedures Order, the "**Assumption Procedures**") of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "**Assumed Contracts**"); and

(f)     granting related relief.

14.     Thereafter, the Debtors seek entry of the Sale Order[2], providing the following relief:

(a)     authorizing and approving the sale of the Assets to the Qualified Bidder (as defined in the Bid Procedures) that the Debtors, after consultation with the Consultation Parties, determine has made the highest and best Qualified Bid (as defined in the Bid Procedures) for some or all of the Assets (the "**Successful Bidder**") (or, if the Successful Bidder fails to consummate the Sale, to the Qualified Bidder with the next-highest or second-best Qualified Bid at the Auction for the Assets (the "**Back-Up Bidder**")), free and clear of all liens, claims, encumbrances, and other interests (other than the any permitted liens and the assumed liabilities) and subject to the terms and conditions of the DIP Order (as defined below);

(b)     authorizing the assumption and assignment of the Assumed Contracts; and

(c)     granting any related relief.

## THE PROPOSED SALE

15.     The Bid Procedures Order, if approved, will establish the following timeline, which

the Debtors believe is appropriate to arrive at a value maximizing transaction:

| Milestones | Proposed Dates |
|---|---|
| Deadline to File Notice of Stalking Horse APA ("**Stalking Horse APA Deadline**") | June 25, 2025[3] |
| Hearing on Bid Procedures and Approval of Stalking Horse Bidder and Bid Protections | July 24, 2025 at 10:00 a.m. ET |
| Deadline to Serve Sale Notice | July 28, 2025 (or two (2) business days following entry of the Bid Procedures Order) |
| Deadline to Serve Contract Assumption/Assignment Notice | August 5, 2025 |
| Deadline to Object to Object to Assumption/Assignment Notice | The date that is 14 days after service of the notice. |
| Deadline to File Proposed Form of Sale Order | August 8, 2025 |
| Sale Objection Deadline (Including Objections to Sale to Stalking Horse Bidder(s) | August 18, 2025 |

---

[2]     Pursuant to the DIP Order, the Sale Order shall be in form and substance acceptable to the DIP Agent and the Required DIP Lenders.

[3]     Unless extended by agreement with the DIP Secured Parties in accordance with the terms of the Interim DIP Order, but in no event later than twenty-one (21) days prior to the Bid Procedures Hearing.

| Milestones | Proposed Dates |
|---|---|
| Bid Deadline (i.e. deadline for a Bidder to submit materials for becoming a Qualified Bidder, including but not limited to an executed agreement, good faith deposit, assets/liabilities covered, contracts/leases covered, identity of Bidder, proof of financial ability to perform) | September 5, 2025 |
| Auction | September 11, 2025 |
| Deadline to File and Serve Notice of Successful and Back-Up Bidders | September 12, 2025 or as soon as practicable following the auction |
| Deadline to Object to Sale to Successful Bidder (other than Stalking Horse Bidder) and Adequate Assurance of Successful Bidder (other than Stalking Horse Bidder) (the "Residual Objection Deadline") | September 17, 2025 |
| Reply in Support of Sale Order | September 19, 2025 |
| Sale Hearing | September 24, 2025 at 10:00 a.m. (ET) |
| Outside Closing Date | September 30, 2025 |

16.     The Debtors believe that this timeline provides a reasonable prospect of receiving the highest and best offer under the circumstances without unduly prejudicing their estates, while ensuring that the Sale Transaction can close no later than September 30, 2025—the sale closing Milestone as extended by the DIP Secured Parties in accordance with the DIP Order. The Debtors also believe that the proposed timeline is sufficient to complete a fair, robust, and open sale process that will maximize the value received for the Assets.

**A.      The Bid Procedures**

17.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order. The Bid Procedures were developed to permit an efficient (but sufficient) marketing and sale process, to promote participation and active bidding, and to ensure that the highest or best offer is received for the Assets. As such, the Debtors believe the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of their estates and all parties in interest.

55734083.3

18.     The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, and the criteria for selecting a successful bidder.

19.     In accordance with Local Rule 6004-1, below is a summary of the Bid Procedures and the procedures for conducting the Auction:

| Provisions Governing Qualifications of Bidders and Qualified Bids<br>**Del. Bankr. L.R. 6004-1 (c)(i)(A) and (B)** | A Bid received from a Bidder before the Bid Deadline that meets the requirements set forth in the Bid Procedures shall constitute a ("**Qualified Bid**"), as determined by the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties.<br><br>These requirements <u>include but are not limited to the following</u>:<br><br>• <u>Executed Agreement</u>: Each Bid must include (a) an offer letter, signed by an authorized representative of the Bidder, pursuant to which the Bidder offers to consummate the Sale Transaction contemplated by such Bid on the terms set forth in the Modified APA (as defined below), together with (b) an asset purchase agreement, which must be based on the form asset purchase agreement (the "**Form APA**") supplied by the Debtors in a designated data room or, if applicable, any Stalking Horse APA, signed by an authorized representative of the Bidder, pursuant to which the Bidder agrees to consummate such proposed Sale Transaction for the Assets referenced therein (together with all ancillary documents and schedules contemplated thereby, a "**Modified APA**"). A Bid must also include a redline of the Modified APA marked against the Form APA.<br><br>• Purchase Price. Each Bid must (a) clearly specify the purchase price to be paid, assuming a purchase of the applicable Assets and assumption of the assumed liabilities (the "**Purchase Price**"); (b) identify separately any cash and non-cash components (which non-cash components shall be limited only to Credit Bids and Assumed Liabilities) of the Purchase Price in United States dollars; and (c) indicate the allocation of the Purchase Price among the applicable Assets. If the Debtors select a Stalking Horse Bidder, the Purchase Price shall exceed the Stalking Horse Bid by at least such additional amount as determined by the Debtors in their reasonable business judgment after consultation with |

the Consultation Parties; provided, however, that the Debtors reserve the right to approve joint Bids that satisfy the foregoing conditions, in consultation with the Consultation Parties.

- Good Faith Deposit: Each Bid must be accompanied by a cash deposit in the amount of ten percent (10%) of the cash Purchase Price contained in the Modified APA, before any adjustments to the Purchase Price, to an escrow account to be identified and established by the Debtors (the "**Good Faith Deposit**"). To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the cash Purchase Price contemplated by such Qualified Bid, the Debtors reserve the right to require that such Qualified Bidder increase its Good Faith Deposit so that it equals ten percent (10%) of the increased Purchase Price.

- Purchased Assets and Assumed Liabilities: Each Bid must clearly provide which of the Assets the Bidder seeks to acquire and which of the assumed liabilities the Bidder agrees to assume.

- Designation of Assigned Contracts and Leases: Subject to the terms of the Modified APA, each Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to be assumed and assigned to the Bidder at the closing of the Sale Transaction.

- Corporate Authority: Each Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate or similar governance authorization of the Bidder to consummate the proposed Sale Transaction; provided that if the Bidder is an entity specially formed for the purpose of effectuating the Sale Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Sale Transaction by the equity holder(s) of such Bidder and any other governing body of the Bidder that is required to approve the Sale Transaction.

- Disclosure of Identity of and Contact Information for Bidder: Each Bid must fully disclose the identity of each entity (including any equity owners, sponsors, or co-investors) that will be bidding for or purchasing the Assets or otherwise directly or indirectly participating in connection with such Bid, as well we contact information for the decision-maker and counsel.

| | |
|---|---|
| | • <u>Proof of Financial Ability to Perform</u>: Each Bid must include written evidence that the Debtors conclude demonstrates that the Bidder has the necessary financial ability to (a) timely close the Sale Transaction contemplated by such Bid by September 30, 2025 or within such other timeframe as agreed by the Debtors and consistent with the DIP Order, and (b) provide adequate assurance of future performance under all contracts to be assumed and assigned in such Sale Transaction |
| **No-Shop or No-Solicitation Provisions**<br><br>**(Del. Bankr. L.R. 6004-1 (c)(i)(C)(1))** | Not applicable. |
| **Break-Up/Topping Fees and Expense Reimbursement**<br><br>**(Del. Bankr. L.R. 6004-1 (c)(i)(C)(2))** | Break-up Fee: fee up to 3.0% of the total cash consideration payable under a Stalking Horse APA.<br><br>Expense Reimbursement: out-of-pocket legal fees and hard costs incurred up to **$100,000**.<br><br>Bid Procedures Order, ¶ G. |
| **Bidding Increments**<br><br>**(Del. Bankr. L.R. 6004-1 (c)(i)(C)(3))** | Any Overbid for all or substantially all of the Debtors' Assets after and above the Auction Baseline Bid shall be made in increments valued at not less than $500,000; provided, however, that the first Overbid shall be the Initial Overbid, which must equal the Bid Protections plus $500,000.<br><br>Bid Procedures Order, ¶ G; Bid Procedures, § E(1). |
| **Treatment of Break-Up and Topping Fees and Expense Reimbursement at Auction**<br><br>**(Del. Bankr. L.R. 6004-1 (c)(i)(C)(4))** | No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, break-up fee, topping or termination fee, or other similar fee or payment, and, by submitting a Bid, such person or entity is deemed to have waived its right to request or file with this Court any request for expense reimbursement or any other fee of any nature in connection with the Auction and the Sale Transaction, whether by virtue of Bankruptcy Code § 503(b) or otherwise.<br><br>Bid Procedures Order, ¶ 10; Bid Procedures, § C(18). |

## B.    The Auction and Sale

20.    If one or more Qualified Bids is received by the Bid Deadline (other than a Stalking Horse APA), the Debtors shall conduct an Auction to determine the highest and best Qualified Bid.  If no Qualified Bid other than any Stalking Horse APA is received by the Bid Deadline, the Debtors, in consultation with the Consultation Parties, shall deem the Stalking Horse APA to be

55734083.3

the Successful Bid without conducting the Auction.  The Debtors seek authority from this Court

to schedule the Auction on a date as further described in the Bid Procedures.

**C.**     **Form and Manner of Sale Notice**

21.     On or within two (2) business days after entry of the Bid Procedures Order, the

Debtors shall cause the Sale Notice to be served on (the "**Sale Notice Parties**"): (i) the Office of

the United States Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis;

(iii) counsel to the DIP Agent, DIP Lenders, Prepetition Agent, and Prepetition Lenders; (iv) the

Internal Revenue Service; (v) the United States Attorney for the District of Delaware; (vi) the

offices of the attorneys general for the states in which the Debtors operate; (vii) all parties known

to the Debtors who hold any liens or security interest in the Assets; (viii) all persons known to

have expressed an interest in acquiring all or any portion of the Assets; (ix) all taxing authorities

having jurisdiction over any of the Assets, including the Internal Revenue Service; (x)  the United

States Environmental Protection Agency; (xi) counterparties to executory contracts and unexpired

leases, as reflected in the Debtors' records; and (xii) any party that has requested notice pursuant

to Bankruptcy Rule 2002.

22.     In addition, by the date that is ten (10) days after the entry of the Bid Procedures

Order or as soon as practicable thereafter, the Debtors will provide notice of the Sale Hearing

through publication of the Sale Notice on the case website and will also publish the Sale Notice,

with any modifications necessary for ease of publication, once in each of the *Wall Street Journal*

and *TMT Finance* to provide notice to any other potential interested parties (the "**Publication**

**Notice**").

**D.**     **Summary of the Assumption Procedures**

23.    The Debtors are seeking approval of certain procedures ("to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale Transaction.    Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Assumed Contracts, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, shall be provided in a separate notice, a proposed form of which is attached to the Bid Procedures Order as **Exhibit 3** (the "**Assumption and Assignment Notice**") to be sent to the applicable contract counterparties (the "**Contract Counterparties**").

24.    Because the Bid Procedures Order describes the Assumption Procedures in detail, they are not restated herein.    Generally, however, the Assumption Procedures: (i) outline the process by which the Debtors shall serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assumed Contracts to the extent necessary.

## BASIS FOR RELIEF

**A.    The Relief Sought in the Bid Procedures Order is in the Best Interests of the Estates and Should Be Approved**

    **1.    The Proposed Notice of the Bid Procedures and the Sale Process is Appropriate**

25.    The Debtors seek authority to sell the Assets through an Auction (if multiple bids are received) and related sale process.    The Debtors and their advisors have conducted and will conduct an extensive marketing process, including prior to entry of the Bid Procedures Order.    The Debtors have a list of "Contact Parties" who will receive or have already received a copy of the

"Information Package." The list of Contact Parties shall encompass those parties who: (i) have executed NDAs with the Debtors, and (ii) whom the Debtors believe may be interested in pursuing a Sale, or whom the Debtors reasonably believe may have the financial resources to consummate such a transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtors' estates for the benefit of their creditors and other stakeholders.

26.    Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections. The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the Bid Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, and (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds.

27.    The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, and the Assumption and Assignment Notice, as provided for herein, constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto in compliance with, and in satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors further submit the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates.

55734083.3

Accordingly, the Debtors respectfully request the Court find the proposed notice procedures set forth in this Motion are sufficient, and no other or further notice of the Bid Procedures, Auction, Sale, or Sale Hearing is required.

## 2. The Bid Procedures are Appropriate and Will Maximize Value

28. Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. See In re Edwards, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Courts have stated that a debtor's business judgment is entitled to deference with respect to the procedures to be used in selling an estate's assets. See, e.g., In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted)); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (quoting Schipper); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (same); see also In re Integrated Resources, Inc., 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (bid procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

29. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003); see also In re Food Barn Stores, Inc., 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain

the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); Edwards, 228 B.R. at 561.

30.     In the present case, the Debtors believe that the proposed Bid Procedures will establish the parameters under which the value of the Assets may be tested at the Auction.  The Debtors believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or best offers available for the Assets.  The proposed Bid Procedures will enable the Debtors to conduct the Sale Transaction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the Sale Transaction.

31.     Specifically, the proposed Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  At the same time, the proposed Bid Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or best offer for the completion of the Sale Transaction.  Additionally, entering into a Stalking Horse APA with a Stalking Horse Bidder ensures the Debtors obtain fair market value by making a minimum purchase price for the Assets that will be tested in the marketplace.  As such, creditors can be assured that the consideration obtained will be fair and reasonable and at or above the market.

32.     Based on the foregoing, the proposed Bid Procedures and associated Sale Transaction process timeline will provide the Debtors with ample time to complete their extensive and robust marketing process, while ensuring that the Debtors are not unnecessarily continuing to incur costs associated with preserving the value of the Assets pending consummation of a Sale Transaction, and reflects a sound exercise of the Debtors' business judgment.

### 3.    The Minimum Overbid Increment is Appropriate

33.    One important component of the proposed Bid Procedures is the "Overbid" provision.  The Debtors believe that such Minimum Overbid Increment (as defined in the Bid Procedures) is reasonable under the circumstances and will enable the Debtors to maximize the value received for the Assets while limiting any potential chilling effect in the marketing process.

### 4.    Entering into a Stalking Horse APA with Bid Protections Has a Sound Business Purpose and Should Be Approved

34.    Pursuant to the Motion, the Debtors are seeking the approval of this Court to designate one or more Stalking Horse Bidder(s), to enter into a Stalking Horse APA, and to offer the Bid Protections.  As noted above, the Debtors believe that designating one or more parties to serve as a Stalking Horse Bidder in connection with the sale of the Assets would further the goal of maximizing the value of the Assets.

35.    Public auctions held in Chapter 11 cases customarily use a stalking horse, which can maximize value by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  Official Committee of Unsecured Creditors v. Interforum Holding LLC, No. ll-CV-219, 2011 WL 2671254 at *1 n.1 (E.D. Wis. July 7, 2011). Stalking horse bidders virtually always require inducements in exchange for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." Id. (citation omitted).  Offering bid protections such as break-up fees to stalking horse bidders has become an established practice in Chapter 11 Cases.

36.    Break-up fees and other forms of bid protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11.  Integrated Res., 147 B.R. at 659-60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets.... In fact, because the directors of a corporation have a duty to encourage bidding,

break-up fees can be *necessary* to discharge the directors' duties to maximize value."). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24,28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); see also Integrated Res., 147 B.R. at 660-61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

37.     As a result, courts routinely approve such bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. See In re Energy Future Holdings Corp., 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees... depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (quoting In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 535 (3d Cir. 1999)) (alterations in original); In re Reliant Energy Channelview LP, 594 F.3d 200,206 (3d Cir. 2010) (same).  Allowing the Debtors to offer Bid Protections to one or more Stalking Horse Bidders will benefit the Debtors' estates and creditors by setting a floor for further bidding that is likely to increase the consideration ultimately given in exchange for the Debtors' Assets.

38.     Furthermore, in the Third Circuit, bid protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. See, e.g., Energy Future, 904 F.3d at 313 ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503."); Women First Healthcare, Inc., 332 B.R. 115, at 121-23 (Bankr. D. Del. 2005) (holding that the general standard used for all administrative expenses applies to bid protections). Thus, the "allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to

show that the fees were actually necessary to preserve the value of the estate." <u>Reliant Energy,</u> 594

F.3d at 206 (internal quotations omitted) (quoting <u>O'Brien,</u> 181 F.3d at 535).

39.    Here, the flexibility to offer Bid Protections—which may include a break-up fee

that is limited to no more than 3.0% of the total cash consideration payable under a Stalking Horse

APA, in addition to any expense reimbursement, plus a reimbursement of reasonable out-of-pocket

expenses, up to a $100,000 cap—is critical to the Debtors' ability to obtain the commitment of one

or more Stalking Horse Bidders.  To qualify as a Stalking Horse Bidder, a Qualified Bidder must

expend substantial time and resources negotiating, drafting, and performing due diligence

activities while also subjecting its Qualified Bid to Court approval and potential overbids by third

parties.  Further, any Bid Protections offered to a Stalking Horse Bidder will have been negotiated

in good faith, at arm's length, and with significant give-and-take.  By preserving the flexibility to

offer Bid Protections, the Debtors ensure their estates can realize the benefit of a transaction with

one or more Stalking Horse Bidders without foreclosing third parties from submitting overbids at

the Auction.  To the extent any party objects to the Bid Protections, such party's ability to object

is preserved, since there will be an objection deadline following the filing of any Stalking Horse

Notice and an opportunity for a hearing.

40.    The Debtors submit that, if granted in their reasonable business judgment, in

consultation with the Consultation Parties, the Bid Protections provided to any Stalking Horse

Bidder (a) will be an actual and necessary cost and expense of preserving the Debtors' estates

within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) will be

commensurate to the real and material benefits conferred upon the Debtors' estates by any Stalking

Horse Bidder, and (c) will be fair, reasonable, and appropriate, including in light of the size and

nature of the proposed Sale Transaction, the commitments that have been made, and the efforts that have been and will be expended by any Stalking Horse Bidder.

41.     If the Court does not approve Bid Protections, the Debtors may struggle to attract and retain Stalking Horse Bidders, jeopardizing the outcome of the Auction and a successful disposition of the Debtors' estates.  Further, if the Debtors ultimately pay the break-up fee included in Bid Protections under any Stalking Horse APA, it will be because the Debtors have received superior offers for the Assets in a successful Auction.  In short, the proposed Bid Protections constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." Integrated Res., 147 B.R. at 662.

42.     The Debtors respectfully submit that the Bid Protections are a sound exercise of their business judgment and are in the best interests of the Debtors, their estates, and all stakeholders.  Accordingly, the Court should approve Bid Protections.

> **5.     The Proposed Notice Procedures for the Assumed Contracts and the Identification of Related Cure Amounts are Appropriate**

43.     As set forth above, the Sale Transaction contemplates the potential assumption and assignment of the Assumed Contracts to the Successful Bidder.  In connection with this process, the Debtors believe it is necessary to establish a process by which: (i) the Debtors and the Contract Counterparties can reconcile cure obligations, if any, in accordance with sections 105(a) and 365 of the Bankruptcy Code, and (ii) such counterparties can object to the potential assumption and assignment of the Assumed Contracts and/or related cure amounts.

44.     The Bid Procedures specify the process by which the Debtors will serve Assumption and Assignment Notices and the procedures and deadline for Assumed Contract Counterparties to Assumed Contracts to file and serve cure or assignment objections.

55734083.3

45.     Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assumed Contract, at the closing of the Sale Transaction, the Successful Bidder shall cure those defaults under the Assumed Contracts that must be cured in accordance with section 365(b) of the Bankruptcy Code, by (i) payment of the undisputed cure amount (the "**Cure Amount**") and/or (ii) reserving amounts with respect to any disputed cure amounts.

46.     As set forth in the Bid Procedures Order, the Debtors also request any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to the assumption and assignment of the applicable Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Assumption and Assignment Notice.

47.     The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties of the potential assumption and assignment of Assumed Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof.   Accordingly, the Debtors request this Court approve the Assumption Procedures set forth in the Bid Procedures Order.

**B.     Approval of the Proposed Sale is Appropriate and in the Best Interests of the Estates**

    **1.     The Sale of the Assets Should Be Authorized Pursuant to Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment**

48.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.  See In re Martin, 91 F.3d at 395 ("[U]nder normal circumstances the court would defer to the trustee's judgment so

55734083.3

long as there is a legitimate business justification."); (citing <u>In re Schipper,</u> 933 F.2d at 515);
<u>Stephens Indus., Inc, v. McClung,</u> 789 F. 2d 386, 390 (6th Cir. 1986); <u>Comm. of Equity Sec.
Holders v. Lionel Corp. (In re Lionel Corp.).</u> 722 F.2d 1063, 1070 (2d Cir. 1983); <u>In re Telesphere
Commc'ns, Inc.,</u> 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); <u>In re Delaware & Hudson Railway
Co.,</u> 124 B.R. 169, 176 (D. Del. 1991).

49.     Once the Debtors articulate a valid business justification, "[t]he business judgment
rule 'is a presumption that in making the business decision the directors of a corporation acted on
an informed basis, in good faith,' and in the honest belief that the action was in the best interests
of the company." <u>In re S.N.A. Nut Co.,</u> 186 B.R. 98,102 (Bankr. N.D. Ill 1995) (citations omitted);
<u>In re Filene's Basement, LLC,</u> No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del.
Apr. 29,2014) ("If a valid business justification exists, then a strong presumption follows that the
agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations
omitted); <u>Integrated Res.,</u> 147 B.R. at 656; <u>In re Johns-Manville Corp.</u>. 60 B.R. 612, 615-16
(Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management
decisions.").

50.     A sound business purpose exists for the sale of the Assets, free and clear of all
encumbrances.  Due and adequate notice of the Sale has been provided, the purchase price reflects
fair value, and the Sale Transaction has been proposed in good faith without collusion or undue
influence. The Debtors will also promptly make the disclosures required under Bankruptcy Rule
6004 and Local Rule 6004-1(b) with respect to any definitive agreement the Debtors enter into,
including any Stalking Horse Agreement.

55734083.3

2.      **Adequate and Reasonable Notice of the Sale Transaction Will Be Provided**

51.     As described above, the Sale Notice will: (i) be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing following entry of the Bid Procedures Order, (ii) inform parties in interest of the deadlines for objecting to the Sale Transaction, and (iii) otherwise include all information relevant to parties interested in or affected by the Sale Transaction. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

3.      **The Sale Transaction and Purchase Price Will Reflect a Fair-Value Transaction**

52.     Where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999). The Debtors will continue to market the Assets and solicit offers consistent with the Bid Procedures and any Stalking Horse APA, including, without limitation, by providing acceptable Bidders with executed NDAs, access to the data room and requested information. In this way, the number of Bidders that are eligible to participate in the competitive Auction process will be maximized. On the other hand, if no Auction is held because no Auction is necessary, any Stalking Horse APA's purchase price conclusively will have been demonstrated to be fair value.

4.      **The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Section 363(f) of the Bankruptcy Code**

53.     The Debtors submit, subject to the terms and conditions of the DIP Order and the DIP Credit Agreement, that it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and other interests (other than any assumed liabilities or permitted liens in the applicable asset purchase agreement) pursuant to section 363(f) of the Bankruptcy Code, with any

23

such claims and interests attaching to the net sale proceeds of the Assets, as and to the extent applicable.

54.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (i) applicable nonbankruptcy law permits such a free and clear sale, (ii) the holder of the interest consents, (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property, (iv) the interest is the subject of a bona fide dispute, or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. See 11 U.S.C. § 363(f).

55.    Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' sale of the Assets free and clear of all interests (i.e., all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

56.    The Debtors will send the Sale Notice to, among others, all parties who, based on the Debtors' records, have asserted liens or claims against the Assets. Any holder of a claim against or interest in the Assets who does not object to the transaction will be deemed to have consented to the sale of the Assets free and clear. See 11 U.S.C. 363(f)(2); see Hargrave v. Twp. of Pemberton, 175 B.R. 855, 858 (Bankr. D.N.J. 1994). Moreover, the Debtors believe that any parties that do object on the basis that they hold liens or claims against the Assets will either: (a) be holders of liens or claims that are subject to a bona fide dispute, or (b) would be compelled to accept cash in satisfaction of their interests. Cf. 11 U.S.C. §§ 363(f)(3) & 363(f)(5). Any

24

lienholder also will be adequately protected by having its liens, if any, attach to any proceeds of the transaction, in the same order of priority, with the same validity, force, and effect, that such creditor had prior to the sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.  Cf. id. § 363(f)(3).  Therefore, pursuant to section 363(f) of the Bankruptcy Code, the Debtors may sell the Assets free and clear of all liens, claims, interests, and encumbrances.

57.    No Successor Liability.  The Debtors' proposed Sale Order will provide that the Successful Bidder shall not have any successor liability related to the Debtors or the Assets to the maximum extent permitted by law.  Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  Courts, however, have consistently held a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.), 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a § 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy).

58.    The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Successful Bidder.  Under section 363(f) of the Bankruptcy Code, the Successful Bidder is entitled to assurance that the Assets are not tainted by latent claims that could be asserted against the Successful Bidder after the proposed transaction is completed.  Absent that ruling, the value of the

25

Assets could be severely compromised.  Accordingly, consistent with the above-cited case law and provisions of the Bankruptcy Code, the order approving the sale of the Assets should state the Successful Bidder is not liable as a successor under any theory of successor liability, for claims or interests that encumber or relate to the Assets.

> **5.     The Sale Transaction Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code Section 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code Section 363(n)**

59.     The Debtors request that the Court find the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

60.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

61.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 from the risk it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good faith."  Although the Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made.  See, e.g., Abbotts Dairies of Pa., 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the

[proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); In the Matter of Andy Frain Servs., Inc., 798 F.2d 1113 (7th Cir. 1986) (same); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

62.    The Debtors submit that any Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  First, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Sale Transaction will be subject to a market process by virtue of Debtors' marketing efforts and the Auction and will be substantial, fair, and reasonable.  Second, the asset purchase agreement entered into by the Debtors and the Successful Bidder will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtors will be, represented by competent counsel, and any purchase agreement with a Successful Bidder will be the culmination of the Debtors' competitive market process and, if necessary, the Auction, in which all negotiations will be conducted on an arm's-length, good-faith basis.  Third, where—as the Debtors anticipate will be the case here—there is no indication of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale Transaction to be avoided pursuant to section 363(n).  Moreover, with respect to potential bidders, the Bid Procedures are designed to ensure no party is able to exert undue influence over the process.  Finally, the Successful Bidder's offer will be evaluated and approved by the Debtors in consultation with their advisors.

55734083.3

63.    Accordingly, the Debtors believe the Successful Bidder and the resulting purchase agreement should be entitled to the full protections of section 363(m) of the Bankruptcy Code. Likewise, because there will be no fraud or improper dealing of any kind, the Sale Transaction does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, the Purchaser should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code.  The Debtors therefore request that the Court make a finding in the Sale Order that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

### 6.    Credit Bidding Should Be Authorized Pursuant to Section 363(k) of the Bankruptcy Code

64.    A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest.  Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value.  See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full-face value of their secured claims under § 363(k)").  Thus, pursuant to section 363(k) of the Bankruptcy Code and subject to the Bid Procedures, all credit bid rights should be preserved for purposes of bidding on the Assets.

**C.    The Assumption and Assignment of the Assumed Contracts Should Be Approved**

**1.    The Assumption and Assignment of the Assumed Contracts Reflects the Debtors' Reasonable Business Judgment**

65.    To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign  Assumed Contracts to the Successful Bidder to the extent required by such Successful Bidder.

66.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  See 11 U.S.C. § 365(b)(1).  Courts generally apply the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.  See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).  Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp), 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule").

67.    Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale Transaction as a sound exercise of the Debtors' business judgment.  First, the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets.  Second, it is unlikely any purchaser would want to acquire the Assets unless a significant number of the contracts needed to manage the day-to-day

operations were included in the transaction.  Third, the Assumed Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases.  Accordingly, the Debtors submit the assumption and assignment of the Assumed Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtors' business judgment.

68.     A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  See 11 U.S.C. § 365(f)(2).  Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

69.     Counterparties to Assumed Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders.  Accordingly, the Debtors submit the assumption and assignment of the Assumed Contracts as set forth herein should be approved.

55734083.3

70.     <u>Anti-Assignment Provisions Unenforceable</u>**.**  To assist in the assumption, assignment, and sale of the Assumed Contracts, the Debtors also request the Sale Order approving the sale of the Assets provide that anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

71.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

72.     Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease.  <u>See</u> <u>Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)</u>, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), <u>cert.</u> <u>denied</u>, 522 U.S. 1148 (1998).  Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  <u>See</u>, <u>e.g.</u>, <u>In re Jamesway Corp.</u>, 201 B.R. 73 (Bankr. S.D.N.Y. 1996).  Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts,

and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

73.    Orders granting motions to sell property and for the assumption and assignment of executory contracts frequently contain language explicitly stating the counterparty to the assumed contracts are barred from asserting against the debtor any default by reason of the closing, including any breach or right of termination relating to a change in control of the debtor.  See, e.g., In re Irish Bank Resolution Corp. Ltd., No. 13-12159 (CSS), 2014 WL 1759609, at *8 (Bankr. D. Del. Feb. 14, 2014) ("[n]o sections or provisions of the Contracts that purport to . . . declare a breach or default as a result of a change in control in respect of the Debtor…shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under 11 U.S.C. § 365(f) and/or are otherwise unenforceable under 11 U.S.C. § 365(e).").  The Debtors seeks such similar language here.

**D.    Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

74.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

75.    In the present case, and as described in detail above, the Debtors the Debtors seek to close the Sale as soon as possible after the Sale Hearing to maximize the value received from the Assets and to comply with the Milestones.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## **NOTICE**

76.    The Debtors have provided notice of this Motion to: (i) the Office of the United States Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Agent, DIP Lenders, Prepetition Agent, and Prepetition Lenders; (iv) the Internal Revenue Service; (v) the United States Attorney for the District of Delaware; (vi) the offices of the attorneys general for the states in which the Debtors operate; (vii) all parties known to the Debtors who hold any liens or security interest in the Assets; (viii) all persons known to have expressed an interest in acquiring all or any portion of the Assets; (ix) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (x)  the United States Environmental Protection Agency; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.


[remainder of page left intentionally blank]

55734083.3

## CONCLUSION

WHEREFORE, the Debtors respectfully request this Court: (i) enter the Bid Procedures Order, (ii) enter the Sale Order, and (iii) grant such other and further relief as is just and proper.


Dated:   June 13, 2025
       Wilmington, DE

**SAUL EWING LLP**

*/s/ Monique DiSabatino*
Evan T. Miller (DE Bar No. 5364)
Monique B. DiSabatino (DE Bar No. 6027)
Paige N. Topper (DE Bar No. 6470)
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
Telephone: (302) 421-6800
evan.miller@saul.com
monique.disabatino@saul.com
paige.topper@saul.com

-and-

**BERNSTEIN, SHUR, SAWYER & NELSON, P.A.**
Lindsay K. Milne (admitted *pro hac vice*)
Adam R. Prescott (admitted *pro hac vice*)
Letson D. Boots (admitted *pro hac vice*)
100 Middle Street
PO Box 9729
Portland, Maine 04104
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
lmilne@bernsteinshur.com
aprescott@bernsteinshur.com
lboots@bernsteinshur.com

*Proposed Counsel to the Debtors and Debtors in Possession*

55734083.3